UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| AFRICAN GROCERY STORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:07CV664 HEA |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

## **OPINION, MEMORANDUM AND ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment, [Doc. No. 18]. Plaintiff has failed to file an opposition to the motion.[1] For the reasons set forth below, the Motion is granted.

## **Introduction**

Plaintiff sought judicial review of the United States Department of

---

[1] The Court notes that several Orders which were mailed to Plaintiff have been returned as "undeliverable." Local Rule 2.06(B) states:

Every pro se party shall promptly notify the Clerk and all other parties to the proceedings of any change in his or her address. If any mail to a pro se plaintiff or petitioner is returned to the Court without a forwarding address and the pro se plaintiff or petitioner does not notify the Court of the change of address within thirty (30) days, the Court may, without further notice, dismiss the action without prejudice. The said thirty day time limit has expired.

Because Defendant's Motion is well taken, the Court will not dismiss this matter without prejudice, but rather, will grant Defendant's motion.

Agriculture's (USDA) decision to permanently disqualify it from participation in the Food Stamp Program. The Food and Nutrition Service (FNS) of the USDA disqualified Plaintiff because it found violations of the Food Stamp Act, 7 U.S.C. §§ 2011, *et seq.* and governing regulations, 7 C.F.R. Parts 278 and 279 (collectively referred to as "the Program"). The disqualification was based on a finding that Plaintiff repeatedly violated the Program by trafficking in food stamps and trading food stamps for something other than eligible food products. Under the governing law, permanent disqualification is a sanction for such activity. 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1).

Plaintiff filed this action, *pro se,* alleging that the USDA discontinued its food stamp program without solid proof and in violation of its rights. Plaintiff alleges that the discontinuation of the food stamp program was based on statistical analysis and "so called past experiences with other stores." The Complaint further alleges that the charge is not based on facts of what transpires in the store, nor was it based on the actual prices of items sold in the store. Defendant now moves for summary judgment that the discontinuation of the Program was based on an abundance of evidence establishing multiple violations of the Program.

**Facts and Background**

Plaintiff has presented no opposition to Defendant's statement of undisputed

material facts, which are as follows:

In May of 2003, African Grocery submitted a Food Stamp Program Application for Stores to USDA. African Grocery was located at 3558 South Grand Avenue in St. Louis, Missouri. African Grocery is owned by Abshir Hossen, who operates it with his wife, Jad Gusha. USDA enabled African Grocery to process Electronic Benefit Transfer (EBT) transactions on May 28, 2003, under the names of Abshir Ismail Hossen and Jama Yussof Abdi. Jama Yussof Abdi ended his association with African Grocery not long after the store opened. Mr. Hossen, the owner of African Grocery, operated a restaurant out of the same location as his grocery store. The grocery store and the restaurant shared the same entrance and exit.

Mr. Hossen admitted that he purchased items from Sam's Club for inventory sold at African Grocery. He also purchased ingredients from Sam's Club for use in his restaurant. In addition, some of the items purchased at Sam's Club were purchased for use in his store, and as inventory.

Don Bailey, an authorization contractor for the FNS with USDA, visited African Grocery on May 20, 2003 to determine its eligibility to participate as a retailer in the Food Stamp Program and made several observations about the store. African Grocery does not offer shopping carts to its customers at the store. African

Grocery had only one EBT terminal (point of sale device) along with one cash register with no optical scanner. African Grocery was described as a "Med/Sm Grocer" and offered limited items.

Under the heading "Certification and Signature," Page 5 of the application informed African Grocery that "[b]y signing your name on this application, you are telling us that: ... (4) you understand that you and the person(s) for whom you are applying are responsible for stopping workers, paid and unpaid, from breaking food stamp rules such as, but not limited to: (a) trading cash for food stamp benefits;…(c) taking food stamp benefits to pay on a credit account or loan; or (d) taking food stamp benefits to pay for items not allowed to be paid for with food stamp benefits. We can take away a store's right to take food stamp benefits as payment for food sold in your store if any owner(s), manager(s), or anyone working in the store violates any of the food stamp law or rules."

On May 28, 2003, USDA sent an Authorization Approval letter to African Grocery. USDA's letter informed African Grocery that USDA "may withdraw authorization for cause at any time." Further, the letter informed African Grocery that "Ownership is responsible for *all* FSP transactions conducted by *all* employees. **Most importantly, ownership is responsible to prevent regulatory violations--** including the exchange of Program benefits for cash, acceptance of benefits in

payment of credit accounts, and sales of ineligible nonfood items for FSP benefits."

On November 28, 2006, FNS provided Mr. Hossen, the owner of African Grocery, an official letter-of-charges alleging regulatory violations including food stamp trafficking based on food stamp debit card transactions conducted by African Grocery during the period of April 2006 through August 2006. As stated in the letter-of-charges, USDA's analysis of EBT activity revealed a repetitive pattern of unreasonable and inexplicable Program activity by African Grocery compared to other similar, authorized grocery stores in Missouri. In fact, FNS found that African Grocery had conducted numerous food stamp transactions that were unfeasible and implausible, if not physically impossible. In the letter-of-charges, USDA set forth 32 transactions between April 2006 and August 2006 reflecting same-cents, even-dollar transactions of over $100. Of these 32 transactions, 10 were over $200 dollars. Such frequency of relatively high-dollar, even-dollar food stamp transactions revealed an inordinate and disproportionate number of such transactions given the variety of product-pricing in the store.

In the letter-of-charges, USDA also set forth 85 transactions of African Grocery between April 2006 and August 2006 reflecting transactions in excess of $200, again showing an inordinate and disproportionate number of high-dollar, EBT

debits ending in an odd-cents value. Of these transactions there were 38 transactions over $300. 8 transactions were over $400.

In the letter-of-charges, USDA also set forth a series of seventeen (17) transactions (a total of 35 transactions) involving different recipient households within elapsed time-frames which are likely impossible due to the store's limited inventory of eligible food products and logistical factors dealing with the store's checkout procedures, and in comparison to patterns of FSP activity in other, authorized small grocery stores in Missouri. For instance, on April 1, 2006, African Grocery conducted a food stamp transaction of $359.04. Only 68 seconds later, African Grocery conducted a second transaction of $362.99 from a different household.

In the letter-of-charges, USDA also discussed 22 transactions which involved transactions from the same household within elapsed time-frames which are likely impossible in relation to the store's limited inventory of eligible food products and logical factors, and in comparison to patterns of FSP activity in other, authorized small grocery stores in Missouri. For instance, on May 1, 2006, African Grocery conducted a food stamp transaction of $88.18. Less than 4 minutes later, the same household posted a second transaction of $465.68. In another example on May 28, 2006, African Grocery posted a transaction of $54.92 from one household. Less

than a minute later, African Grocery posted a second transaction of $285.09.

Further, the letter-of-charges set forth a series of 11 transactions from African Grocery involving the same household with multiple transactions occurring on the same date from different stores that are improbably and likely impossible. For instance, on July 28, 2006, one household posted a transaction of $93.68 at a store other than African Grocery that was located about a mile away. Within just 39 minutes, African Grocery posted a transaction of $304.25 with the same household. In another transaction on May 3, 2006, a food stamp recipient posted a transaction of $104.06 at a store near African Grocery. African Grocery then posted a transaction of $467.01 just 31 minutes later from that same food stamp recipient.

To further investigate incidents of potential EBT fraud occurring at African Grocery Store, USDA conducted surveillance of the store on a number of business days. During these surveillances, both entrances/exits to African Grocery were monitored by a member of the investigating team visually and/or by camera. On May 4, 2006, surveillance of African Grocery was conducted from 8:17 in the morning until 12:10 p.m. in the afternoon. While there were 5 food stamp transactions posted by African Grocery that day, not one customer was seen leaving the store with groceries. Of those 5 transactions, there were 2 transactions of the

exact same amount, $86.82, posted within a minute apart.

On May 5, 2006, African Grocery posted a transaction of $155 at 10:46 a.m., but no customers left the store until 11:58 a.m., and that customer had only one bag of groceries. In addition, on May 5, 2006, there was a transaction of $200.99 posted at 10:47 a.m., and again no customers left the store until 11:58 a.m. There was also a transaction posted at 12:34 p.m. on May 5, 2006 for $314.16, but no customer was seen leaving the store with groceries until 3:19 p.m. when one person left with one bag of groceries.

On May 19, 2006, African Grocery posted a transaction of $500 at 5:02 p.m. By 8:00 p.m. that evening when surveillance ended, no one had exited African Grocery carrying groceries.

On June 2, 2006, African Grocery posted a transaction at 4:31 p.m. for exactly $395. No customer was seen leaving African Grocery before 6:06 p.m. when the surveillance ended for the day. Mr. Hossen admitted that he cannot remember specific transactions that occurred at his store from a particular day.

When questioned about the fact that customers were seen exiting the store without groceries after posting high dollar transactions, Mr. Hossen admitted to allowing customers to pay off store "credit" accounts with their food stamps rather than purchase food items.

African Grocery responded to FNS's letter-of-charges dated November 28, 2006 with three separate undated statements. African Grocery's response included some notes from customers of African Grocery which mainly focused on the restaurant part of the store, a "Petition for The African Grocery Store," a letter from the International Institute, and a letter from African House. In general, African Grocery argued that its patrons shop differently than patrons of other American stores. In addition, Mr. Hossen claims that the high dollar transactions relate to the large amounts of halal goat meat purchased by its customers.

After the investigation discussed above, on January 25, 2007, the Wichita Field Office of USDA made a final determination regarding regulatory violations at African Grocery. After reviewing the prohibited transactions and Mr. Hossen's response, USDA concluded that the information and explanation provided by Mr. Hossen did not refute evidence of alleged noncompliance. As USDA's regulations mandate permanent disqualification for even a single incident of trafficking, USDA permanently disqualified African Grocery from the Program. USDA's letter notified African Grocery of its ability to seek further administrative review. Plaintiff seeks a determination that the disqualification was not proper.

## **Discussion**

The standards for summary judgment are well settled. In determining whether

summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005); *Littrell v. City of Kansas City, Mo.,* 459 F.3d 918, 921 (8th Cir. 2006). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *Anderson* 477 U.S. at 256; *Littrell ,* 459 F.3d at 921. "The party opposing summary judgment may not rest on the allegations in its pleadings; it must 'set forth specific facts showing that there is a genuine issue for trial.'" *United of Omaha Life Ins. Co. v. Honea,* 458 F.3d 788, 791 (8th Cir.2006) (quoting Fed.R.Civ.P. 56(e)); "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)." *Hitt v. Harsco Corp.,* 356 F.3d 920, 923 (8th Cir.

2004). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question. *Anderson,* 477 U.S. at 248; *Woods,* 409 F.3d at 990. To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.' *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)(quotation omitted)." *Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003). A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor. *Wilson,* 62 F.3d at 241. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. 242 at 252; *Davidson & Associates v. Jung* 422 F.3d 630, 638 (8th Cir. 2005). Viewing the evidence in the light most favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable inferences, if there are no genuine issues of material fact, the moving party is entitled to judgment as a matter of law. *Samuels v. Kansas City Mo. Sch. Dist.,* 437 F.3d 797, 801 (8th Cir.2006).

The Food Stamp Act and its regulations, found at 7 C.F.R. § 279.10, provide for judicial review of a decision by the Food Stamp Review Officer. The statute

provides for a "trial de novo" and states that the Court "shall determine the validity of the questioned administrative action in issue." Review *de novo* means that the Court should make an independent determination of the issues. *United States v. First City Nat'l Bank*, 386 U.S. 361, 368 (1967); *Ghattas v. United States*, 40 F.3d 281, 286 (8th Cir.1994). Although the issue before the Court is whether the agency action was invalid, this Court need not limit itself to the administrative record in reaching its decision. See generally *Sims v. United States Dep't of Agric. Food & Nutrition Serv.*, 860 F.2d 858, 862 (8th Cir.1988) (finding that the Food Stamp Act's *de novo* review requires the district court to "'... reach its own factual and legal conclusions based on the preponderance of the evidence, and [not to] limit its consideration to matters previously appraised in the administrative proceedings.'") (citing *Ibrahim v. United States*, 834 F.2d 52, 53-54 (2nd Cir.1987)). Based on the record before the Court, the evidence establishes that Defendant's permanent disqualification of Plaintiff was supported by a preponderance of the evidence.

Under the Food Stamp Act, a retail food store is subject to permanent disqualification from further participation in the Food Stamp program upon a determination that the store has engaged in "the purchase of coupons or trafficking in coupons or authorization cards." 7 U.S.C. § 2021(b)(3)(B). In the administrative decision now under review, the FNS determined that Plaintiff's store had engaged in

food stamp trafficking.

The FNS's finding of food stamp trafficking rested upon various grounds:

There was a repetitive pattern of unreasonable and inexplicable Program activity by African Grocery compared to other similar, authorized grocery stores in Missouri; African Grocery had conducted numerous food stamp transactions that were unfeasible and implausible, if not physically impossible. Thirty-two transactions between April 2006 and August 2006 reflecting same-cents, even-dollar transactions of over $100. Of these 32 transactions, 10 were over $200 dollars. Such frequency of relatively high-dollar, even-dollar food stamp transactions revealed an inordinate and disproportionate number of such transactions given the variety of product-pricing in the store.

Furthermore, eighty-five transactions of Plaintiff between April 2006 and August 2006 reflecting transactions in excess of $200, again showing an inordinate and disproportionate number of high-dollar, EBT debits ending in an odd-cents value; 38 of these transactions were over $300; 8 transactions were over $400.

There was a series of seventeen (17) transactions (a total of 35 transactions) involving different recipient households within elapsed time-frames which are likely impossible due to the store's limited inventory of eligible food products and logistical factors dealing with the store's checkout procedures, and in comparison to patterns

of FSP activity in other, authorized small grocery stores in Missouri.  Specifically, on April 1, 2006, Plaintiff conducted a food stamp transaction of $359.04.  Only 68 seconds later, Plaintiff conducted a second transaction of $362.99 from a different household.   Considering one POS terminal and no shopping carts in the store, these transactions are clearly suspect.

Likewise the 22 transactions which involved transactions from the same household within elapsed time-frames are likely impossible in relation to the store's limited inventory of eligible food products and logical factors, and in comparison to patterns of FSP activity in other, authorized small grocery stores in Missouri.  For instance, on May 1, 2006, Plaintiff conducted a food stamp transaction of $88.18.  Less than 4 minutes later, the same household posted a second transaction of $465.68.  In another example on May 28, 2006, Plaintiff posted a transaction of $54.92 from one household.  Less than a minute later, Plaintiff posted a second transaction of $285.09.

A series of 11 transactions from Plaintiff involving the same household with multiple transactions occurring on the same date from different stores that are improbably and likely impossible.  For instance, on July 28, 2006, one household posted a transaction of $93.68 at a store other than African Grocery that was located about a mile away.  Within just 39 minutes, African Grocery posted a transaction of

$304.25 with the same household. In another transaction on May 3, 2006, a food stamp recipient posted a transaction of $104.06 at a store near African Grocery. African Grocery then posted a transaction of $467.01 just 31 minutes later from that same food stamp recipient. Such transactions are virtually impossible considering the size of Plaintiff's store and the eligible items for sale, not to mention the actual logistics of the recipient household purchasing at one store and then immediately entering Plaintiff's store, locating eligible items and then actually having the items "rung up" and processed at the single cash register and POS terminal.

Moreover, the surveillance conducted by the USDA revealed that on several occasions, the large amounts posted by Plaintiff did not correspond with the number and time of customers leaving the store nor with the amount of groceries those customers took with them upon leaving the store.

In response to Defendant's letter of charges, Plaintiff essentially merely urged that certain items sold, such as halal goat meat, are expensive. The owner also admitted that he had allowed customers to pay off store credit with their food stamps. Plaintiff's explanations are somewhat wanting, to say the least.[2] Plaintiff itself recognized that it had violated the conditions of the authorization by allowing

---

[2] Under the summary judgment standards, the explanations previously given are insufficient to survive the challenge, in light of the fact that the explanations are neither admissible evidence nor reliable because of the self serving nature of the statements.

recipients to use food stamps to pay down store credit.  Furthermore, the mere attempt to, in essence, argue that items are expensive, and therefore justify such high dollar amount transactions comes nowhere near establishing that violations did not occur.

Yet, even if Plaintiff could be said to have identified genuine issues of fact with regard to some categories of suspicious transactions cited by the FNS, Plaintiff has utterly failed to controvert whatsoever Defendant's substantial evidence of the improbable, if not impossible, transactions occurring within minutes of previous transactions at other stores, exact amount transactions, or the surveillance evidence of timing, amounts and customers leaving the store, to name but a few of the documented violations.

As Defendant points out, the Food Stamp Act expressly allows disqualification decisions to be based upon "evidence obtained through a transaction report under an electronic benefit transfer system."  7 U.S.C. § 2021(a); see also 7 C.F.R. § 278.6(a).  Accordingly, the courts have upheld disqualification decisions based on the analysis of EBT data comparable to that which the FNS performed in this case. See, *e.g.*, *Idias v. United States*, 359 F.3d 695, 698 (4th Cir.2004); *McClain's Market*, 411 F.Supp.2d at 776-77, aff'd, 2006 WL 3780304 (6th Cir. Dec.20, 2006); *Kahin*, 101 F.Supp.2d at 1303-04.  There simply is no requirement under the Food

Stamp Act that a store be "caught 'red-handed' engaging in food stamp or EBT card fraud" before it may be disqualified from participating in the Food Stamp program. *Kahin*, 101 F.Supp.2d at 1303. Rather, circumstantial evidence may suffice, and the evidence here strongly supports the FNS's determination that Plaintiff's store had engaged in food stamp trafficking.

## Conclusion

Based upon the foregoing analysis, the record before this Court establishes by a preponderance of the evidence that Defendant's permanent disqualification of Plaintiff from participation in the food stamp program was justified.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, [Doc. No. 18], is **GRANTED.**

A separate judgment in accordance with this Opinion, Memorandum and Order is entered this same date.

Dated this 20th day of March, 2008.

_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE